IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,        §
                                 §
                 Plaintiff,      §
                                 §    Criminal No. 3:09-CR-276-D
VS.                              §
                                 §
                                 §
JEFFREY CAMPOS, et al.,          §
                                 §
                 Defendants.     §

MEMORANDUM OPINION
AND ORDER

    Defendants Jeffrey Campos ("Campos") and Eric Tobias
("Tobias") move to suppress evidence——drugs, currency, weapons, and
drug paraphernalia——seized during the search of a residence
conducted pursuant to a search and arrest warrant, contending the
warrant is invalid under the Fourth Amendment.  Following a
hearing, and for the reasons that follow,[1] the court denies the
motions.

I

    On March 13, 2009 Investigator Ken Fay ("Inv. Fay") of the
Irving Police Department ("IPD") received a tip from a confidential
informant that a sale of one ounce of cocaine was about to occur at
a Taco Cabana in Irving.  Inv. Fay, in turn, contacted Sergeant
Kirk LeCroy ("Sgt. LeCroy"), an IPD narcotics officer.  Inv. Fay
and other IPD officers arrived at the Taco Cabana and, acting in

_____

    [1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in
this memorandum opinion and order its essential findings.

undercover capacities, conducted surveillance of the impending drug transaction.

Inv. Fay observed two persons (the buyers) enter the Taco Cabana.   The seller, later identified as Leonso Alvarez ("Alvarez"), arrived thereafter.   After Alvarez arrived, he and the buyers departed from the Taco Cabana in two separate vehicles, followed by IPD officers acting undercover.   Officers lost the buyers' vehicle in traffic, but Alvarez was stopped for a traffic violation after he failed to signal a lane change.   During the stop, it was determined that Alvarez was driving with a suspended license, and he was arrested.

During an inventory search of Alvarez's vehicle, IPD officers found scales, a substance that field-tested positive for cocaine, and plastic drug distribution bags.   Alvarez's cell phone also contained text messages that were recognized as "dope notes," i.e., messages that referenced drug transactions.

Following Alvarez's arrest, he was taken to the Irving police station, where he was interviewed by Sgt. LeCroy.   During the interview, Alvarez initially lied to Sgt. LeCroy, telling him that he had gone to the Taco Cabana to purchase two grams of hydroponic marihuana.   Alvarez also gave other untrue and evasive answers. Sgt. LeCroy has experience with persons who try to minimize their roles in criminal offenses, and he informed Alvarez that the police knew this was not true.   Alvarez admitted that he was present to

- 2 -

sell one ounce of cocaine.

Sgt. LeCroy was interested in obtaining information about Alvarez's supplier. Alvarez told Sgt. LeCroy that he had purchased one ounce of cocaine earlier in the day at a residence located in Dallas, Dallas County, Texas ("Ivywood House").[2] Alvarez was able to describe in very specific detail the exterior and interior of the Ivywood House and describe the people who supplied him the cocaine, although he did not know the address of the house. He advised Sgt. LeCroy that he had made the purchase from a man he knew as "Johnny";[3] that he did not observe Johnny in person that day, although he heard Johnny's voice coming from the kitchen; and that a Hispanic male about the age of 18 actually gave him the cocaine. Alvarez specifically described Johnny's physical appearance, more generally described the Hispanic male,[4] also

_____

[2]The specific house number is identified in the record. For privacy purposes, the court will identify the residence by its street, city, and county. *See* Fed. R. Crim. P. 49.1(a)(5) (providing that, unless court orders otherwise, filing that contains home address of individual should include only the city and state of home address).

[3]In the interview, Alvarez spelled Johnny's name "Jony." Because "Johnny" is the spelling used in the warrant, the court will also use that spelling.

[4]Alvarez described Johnny as approximately 18-years old, 5'2", 180 pounds, Hispanic, with blonde hair and a short fade haircut. He also stated that Johnny had deep pocks on his face caused by acne, that he had a speech impediment, and that he wore gold-rimmed glasses. He described the second Hispanic male as approximately 18-years old, 5'6", weighing 120 pounds, with brown hair and a burr haircut. In the affidavit accompanying the search warrant, Johnny was described as: "John Anthony Garcia, AKA Johnny, [H]ispanic

described other subjects who were usually present at the residence, and drew a map of the interior of the residence (although he usually went only as far as the living room when there). He also related that Johnny drove two cars: a dark-colored Ford F150 pickup and a silver Cadillac. He did not claim to have seen any drugs other than the cocaine he purchased. Sgt. LeCroy concluded from this information that Alvarez had been there on numerous occasions.

Sgt. LeCroy asked Alvarez to accompany him to the Ivywood House to positively identify the house, which Alvarez did.[5] In directing Sgt. LeCroy to the residence, Alvarez knew every street and did not hesitate. While parked in front of the Ivywood House, neither Sgt. LeCroy nor Alvarez observed any activity in the residence, but the visit confirmed Alvarez's earlier physical description of the house. On the return trip, Alvarez informed Sgt. LeCroy to be careful because the occupants had guns. Alvarez said he had overheard a conversation about weapons when he was at the Ivywood House to purchase cocaine.

---

male, date of birth [redacted for this memorandum opinion under Rule 49.1(a)(2)], approximately 5'05" in height and approximately 180 pounds in weight. Brown hair, brown eyes and acne on his face. Texas drivers license number [redacted for this memorandum opinion under Rule 49.1(e)(1)]." The second male was described as: "Unknown [H]ispanic male, approximately 18 years of age, approximately 5'06" in height and approximately 120 pounds in weight." D. Campos Br. Ex. A at 2.

[5]Alvarez was still in custody and was wearing handcuffs during the trip. Despite being handcuffed, he was able to point out the Ivywood House.

Using a database of criminal records, the Irving police determined that John Anthony Garcia ("Garcia")[6] was known to reside at the Ivywood House. Inv. Fay testified that the IPD searched the TDEX database by putting in the name "Johnny" and the address. TDEX returned Garcia's name at the Ivywood House address. Officers then input Garcia's name and date of birth into the AIS database. This database contained a photo of Garcia and indicated that he had been handled by the Dallas police. Sgt. LeCroy showed Alvarez this photo, and he positively identified Garcia as the person he knew as "Johnny."[7] Additionally, Inv. Fay believed that Alvarez had Garcia's telephone number in his cell phone. The police did not know that the Garcia at the Ivywood House was their suspect until Alvarez positively identified him from the photo.

Sgt. LeCroy relayed this information to Inv. Fay, who drafted an affidavit for a no-knock search and arrest warrant. Inv. Fay had had no prior dealings with Alvarez and no other basis to believe he was a reliable source of information. The entire investigation related to the Ivywood House began and concluded on March 13, 2009, starting with the arrest of Alvarez and his positive identification of Garcia from the photo.

---

[6]Garcia has been indicted in this case but has not yet entered an appearance.

[7]Alvarez's description of Johnny, given before seeing the photo of Garcia, matched the photo precisely, including the details of Johnny's acne and gold-rimmed glasses.

- 5 -

Inv. Fay presented the affidavit for search and arrest warrant to a Dallas County magistrate, who signed the warrant at 9:26 p.m. on March 13. Pursuant to the warrant, officers conducted a search of the Ivywood House on that same date. During the search, they discovered and seized cocaine, methamphetamine, marihuana, U.S. currency, rifles, pistols, ammunition, and other related items. In addition, officers arrested five men, including Campos and Tobias. Defendants are now charged with conspiracy to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B).

Defendants move to suppress the evidence obtained during the search. In sum, they contend that the warrant was procured based on uncorroborated information obtained from an untruthful and unreliable informant; based on an affidavit that omitted pertinent facts about the informant and other important information that would have provided the reviewing magistrate more information to make a probable cause determination; and based on insufficient information for the magistrate to conclude there was probable cause. Defendants also maintain that the magistrate abandoned his role as a neutral and detached magistrate by rubber stamping the affidavit and search warrant, because there was not enough information to conclude there was probable cause. And they posit that the warrant permitted a general search and seizure because the

warrant contained boilerplate language used by the IPD and not corroborated by an independent police investigation, and the listed items in the warrant did not particularly describe what was to be searched or found. The government responds that the good-faith exception applies because the officers acted in objectively reasonable good faith reliance based on a search warrant that was supported by probable cause.

II

Under the Fourth Amendment, "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The exclusionary rule precludes the government from relying on illegally-seized evidence. *United States v. Houltin*, 566 F.2d 1027, 1030 (5th Cir. 1978). The purpose of the exclusionary rule is to "deter unlawful police conduct." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006). This purpose will not be served, and thus the rule is inapplicable, where evidence is obtained in "objectively reasonable good-faith reliance upon a search warrant." *Id.* (internal quotation marks omitted).

In reviewing a search pursuant to a warrant, the court engages in a two-step inquiry. *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003). First, the court determines whether the good-faith exception to the exclusionary rule applies. *Id.* (citing

- 7 -

*United States v. Pena-Rodriguez*, 110 F.3d 1120, 1129 (5th Cir. 1997)). If it does, the court "need not reach the question of probable cause for the warrant unless it presents a 'novel question of law,' resolution of which is 'necessary to guide future action by law enforcement officers and magistrates.'" *Id.* (citing *Pena-Rodriguez*, 110 F.3d at 1130 n.10). Second, if the good-faith exception does not apply, the court proceeds to a determination of whether "'the magistrate had a substantial basis for . . . concluding that probable cause existed.'" *United States v. Lampton*, 158 F.3d 251, 258 (5th Cir. 1998) (ellipsis in original) (quoting *Pena-Rodriguez*, 110 F.3d at 1129).

"Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith." *Payne*, 341 F.3d at 399 (citing *United States v. Leon*, 468 U.S. 897, 921-25 (1984)). The good-faith exception cannot apply if one of four circumstances is present:

> (1) [i]f the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the

> things to be seized that the executing
> officers cannot reasonably presume it to be
> valid.

*Id.* at 399–400 (quoting *United States v. Webster*, 960 F.2d 1301, 1307 n.4 (5th Cir. 1992) (per curiam)).

III

Defendants' arguments in support of their suppression motions focus largely on the unreliability of Alvarez as an informant under *Illinois v. Gates*, 462 U.S. 213 (1983). In *Gates* the Court held that a magistrate can only find probable cause based on an informant's testimony when a totality of the circumstances indicates credibility and reliability. *Id.* at 230. Defendants——particularly Campos——brief the motion almost as if this case involved a warrantless search conducted after receiving a tip from an informant. Campos, for example, cites *Leon*, but he does not explicitly attempt to show how his arguments satisfy one or more particular *Leon*-based exceptions. But when, as here, a magistrate has issued a warrant, *Leon* requires reviewing courts to treat the resulting search as presumptively valid under the good-faith exception. *See Leon*, 468 U.S. at 914 ("[W]e have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). To suppress evidence of a search pursuant to a valid warrant, the defendants, who carry the burden, must prove one of

the four exceptions to the general rule that a warrant once issued is presumptively valid. The reliability *vel non* of the informant who supplied the information found in the affidavit presented to the magistrate is not explicitly considered under any prong of the *Leon* framework. Because defendants do not clearly present arguments that fall under one or more specific *Leon*-based exceptions, the court will assume that their contentions relate to the first exception: the magistrate was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth. The court will also analyze defendants' other arguments specifically in relation to the four *Leon* exceptions.

IV

A

Defendants argue that the affidavit failed to mention potential weaknesses in the reliability of Alvarez as an informant, and by doing so misled the magistrate. For example, the affidavit omitted the fact that Alvarez had initially lied to the police by claiming he was at the Taco Cabana to buy hydroponic marihuana instead of to sell cocaine. The affidavit likewise omitted the fact that Alvarez was unknown to the police before the afternoon the affidavit was executed. The "narcotic trafficking investigation" mentioned in the affidavit had only commenced on March 13, 2009, the day Inv. Fay sought the warrant.

- 10 -

Defendants also maintain that, despite these weaknesses, police did not sufficiently corroborate Alvarez's statements, such as by determining the ownership of the Ivywood House.  The IPD did not check either the Dallas County Appraisal District ("DCAD") records or public utility records before Inv. Fay averred in the affidavit that Garcia and the unknown Hispanic male were in control of the premises.  In fact, another person——not one of the defendants——was shown as the owner of the Ivywood House in DCAD records.  The Irving police had no prior knowledge of Garcia or of the Ivywood House.  Defendants contend this lack of thoroughness demonstrates Inv. Fay's reckless disregard of the truth.

B

The court rejects these contentions.  None of these arguments is sufficient to come under the first *Leon* exception because none establishes the necessary state of mind.  The first exception requires "requisite *mens rea*," *United States v. Torres*, 2009 WL 3199651, at *5 (5th Cir. Oct. 6, 2009) (per curiam) (emphasis in original), namely, that the affiant "intended to or believed he was likely misleading the court as to the basis for or strength of his belief."  *Id.*  Nowhere in the affidavit did Inv. Fay swear to Alvarez's reliability as an informant.  No fact asserted in the affidavit was false in this respect.  Further, "[n]egligent omissions will not undermine the affidavit."  *United States v. McCarty*, 36 F.3d 1349, 1356 (5th Cir. 1994) (citing *United States*

- 11 -

*v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)).  Moreover, assuming that Inv. Fay implicitly represented to the magistrate that Alvarez was a reliable informant, defendants have presented no evidence that any allegedly omitted information was "intentionally or recklessly placed in the affidavit."  *Torres*, 2009 WL 3199651, at *5.  Defendants have failed to demonstrate an intention to leave out key details, to present persuasive evidence that any omission of details of the conversation with Alvarez was not merely inadvertent or negligent, or to present evidence that Inv. Fay acted with *mens rea*.

As to whether a lack of corroboration can be found to establish recklessness, "[t]here is no set requirement that all tips be corroborated by subsequent police investigation in order to be considered credible.  Whether subsequent corroboration is necessary must be determined in the light of the totality of the circumstances presented by the particular set of facts."  *United States v. Blount*, 123 F.3d 831, 836 (5th Cir. 1997) (en banc).  Inv. Fay could have believed in good faith, based on several factors, that he needed no further corroboration before requesting a warrant.  He could have relied on Alvarez's first-hand knowledge,[8] repeated dealings with Johnny, and statements against

---

[8]An informant's "recent, personal observation" has frequently been found to be an indicator of reliability.  *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006); *see also United States v. Satterwhite*, 980 F.2d 317, 322 (5th Cir. 1992) ("That the [informant] personally observed these events demonstrates that he

- 12 -

penal interest.[9]  Additionally, Alvarez's detailed descriptions of both the Ivywood House and Johnny were precisely confirmed before the execution of the affidavit by the picture of Garcia found in the police database and by the trip to the Ivywood House led by Alvarez.  *See United States v. Grazioso*, 2006 WL 2285585, at *6 (N.D. Tex. Aug. 9, 2006) (Fitzwater, J.) ("'[B]ecause an informant is right about some things, he is more probably right about other facts'——including the claim regarding . . . the illegal activity." (quoting *Gates*, 462 U.S. at 244 (ellipsis in original))), *aff'd*, 2008 U.S. App. LEXIS 6813 (5th Cir. Mar. 31, 2008) (per curiam). The lack of subsequent corroboration or investigation therefore does not indicate that Inv. Fay was reckless regarding the veracity of the information in the affidavit.

### C

Defendants offer a handful of other arguments that are appropriately analyzed under the first *Leon* exception.   In particular, they point to a statement in Inv. Fay's affidavit indicating that Garcia "has a criminal history for aggravated assault with a deadly weapon and prohibited weapons."  D. Campos Br. Ex. A at 4.  Defendants have adduced evidence that Garcia did not have such a conviction on his record.  Additionally, the

_____

obtained his information in a reliable way.").

[9]Admissions against penal interest "'carry their own indicia of credibility.'"  *Satterwhite*, 980 F.2d at 323 (quoting *United States v. Harris*, 403 U.S. 573, 583 (1971)).

affidavit was unclear about who had exchanged text messages with Alvarez regarding drug transactions.  The affidavit also failed to note that Alvarez had never observed drugs at the Ivywood House, other than the ones he purchased.  Finally, the affidavit did not detail that Alvarez knew only that Garcia was named "Johnny" and had described Johnny physically, but that the other details regarding Garcia provided in the affidavit were found by searching a state database.

Defendants have failed to demonstrate that any of these alleged misrepresentations was material.  *See McCarty*, 36 F.3d at 1356 ("Absent evidence of an intentional material misrepresentation or omission in the affidavit, the warrant will not be invalidated.").  Removing any misstatements in the affidavit or including any omissions, the affidavit still established a sufficient basis to find probable cause that drug trafficking was occurring at the Ivywood House.  *See United States v. Arispe*, 328 Fed. Appx. 905, 906-07 (5th Cir. 2009) (per curiam) (after presuming that omitted information had been included in affidavit, holding there was sufficient probable cause); *Grazioso*, 2006 WL 2285585, at *8 (addressing warrantless traffic stop) ("[E]ven excluding the information about the canine sniff, the search warrant affidavit contained sufficient true facts giving the magistrate a substantial basis for concluding that probable cause existed.").  In particular, the affidavit made clear the true facts

- 14 -

that Alvarez admitted to drug trafficking, described with particularity both Johnny and the Ivywood House, stated that this was Alvarez's source on multiple occasions for narcotics, and stated that Alvarez had personally purchased cocaine at the Ivywood House that same day.   These facts were sufficient to support a finding of probable cause.

V

Defendants also contend that the fruits of the search must be suppressed because the warrant was issued in response to Inv. Fay's "bare bones" affidavit, which was so lacking any indication of probable cause as to render official belief in its existence entirely unreasonable.   This argument, which falls under the third *Leon* exception, also lacks force.

The warrant and attached affidavit contained sufficient detail to make the warrant's validity credible on its face.   "Generally, examples of 'bare bones' affidavits include those that merely state that the affiant 'has cause to suspect and does believe' or '[has] received reliable information from a credible person and [does] believe' that contraband is located on the premises."   *Pope*, 467 F.3d at 920 (citing *United States v. Brown*, 941 F.2d 1300, 1303 n.1 (5th Cir. 1991)) (alterations in original).   Inv. Fay's affidavit was not bare-bones.   It detailed the IPD's interaction with Alvarez, including information that would reasonably lead a magistrate to believe that Alvarez had familiarity with drug

trafficking.  Alvarez's claim of repeated interactions with Garcia indicated that he had personal knowledge that the persons and the location described in the affidavit were related to cocaine trafficking.  Additionally, the affidavit contained detailed descriptions both of the location to be searched and of Garcia.[10] Admittedly, Inv. Fay included some so-called "boilerplate" language in describing the items for which the police were searching, including, for example, his descriptions of "Telephone and address books" or "Computer hardware."  D. Campos Br. Ex. A at 1.  But this does not defeat the validity of the warrant.  The Fifth Circuit has held that boilerplate assertions that were "based on the affiant's extensive experience and training and involve[d] generalizations about the types of evidence that may be found in drug dealers' residences, [did] not undermine the reasonableness of reliance on the warrant."  *United States v. Broussard*, 80 F.3d 1025, 1034 (5th

---

[10]Defendants complain, in particular, about the generality of the description of the second person identified as "number 3" in the affidavit.  *See* D. Campos Br. Ex. A at 2.  It reads: "Unknown [H]ispanic male, approximately 18 years of age, approximately 5'06" in height and approximately 120 pounds in weight [residing at the Ivywood House]."  Defendants correctly point out that this description would apply to a large group of people.  But the Fifth Circuit has held that similarly-vague descriptions are "sufficiently specific" to render a warrant facially valid.  *See United States v. Rodriguez*, 344 Fed. Appx. 93, 95 (5th Cir. Sept. 9, 2009) (per curiam) (holding that warrant that described "a medium complexion Hispanic male by the name of Felipe (AKA Kitty) approximately 25 to 30 years old and weigh[ing] approximately 200 lbs, approximately 5'8" tall and b[a]l[d]" (second alteration in original) was facially valid).  In any case, defendants challenge only the introduction of the evidence recovered in the search of the Ivywood House, not the arrests of the defendants.

Cir. 1996) (citing cases).

Moreover, an affidavit must only "furnish[] adequate 'information to allow the conclusion that a fair probability existed that seizable evidence would be found.'" *United States v. Cisneros*, 112 F.3d 1272, 1279 (5th Cir. 1997) (quoting *United States v. Restrepo*, 994 F.2d 173, 189 (5th Cir. 1993)).   The probable cause standard does not require that an affiant prove his information beyond a reasonable doubt or even by a preponderance of the evidence.   Finally, the court need not "attempt an 'expedition into the minds of police officers' to determine their subjective belief regarding the validity of the warrant."   *Payne*, 341 F.3d at 400 (quoting *Leon*, 468 U.S. at 922 n.23).

An objective reading of the warrant and attached affidavit indicates that the affidavit was not so lacking any indication of probable cause as to render official belief in its existence entirely unreasonable.

VI

Defendants also posit that the magistrate who issued the warrant abandoned his judicial role and acted merely as a "rubber stamp" to the police's investigation.   The court again disagrees.

The *Leon* exception for a magistrate's abandoning his judicial role is applied infrequently and only in extreme cases.   The example cited by the Supreme Court in *Leon* involved a magistrate who abandoned his neutral and detached role by becoming the leader

of a police search, assisting in personally executing the warrant
he had issued.  *See Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319,
326-27 (1979).   There is no hint of such extreme action in this
case.   Moreover, the magistrate did not merely rubber stamp the
police's efforts; there was sufficient evidence for the magistrate
to reasonably find probable cause, as explained above.   Probable
cause is evaluated utilizing a totality of the circumstances test.
*See, e.g., United States v. Dickey*, 102 F.3d 157, 162 (5th Cir.
1996).   "The task of the issuing magistrate is simply to make a
practical,   common-sense   decision   whether,   given   all   the
circumstances . . . there is a fair probability that contraband or
evidence of a crime will be found in a particular place."   *Gates*,
432 U.S. at 238.   The judge is permitted to draw reasonable
inferences, and his determinations are to be paid "great deference"
by reviewing courts.   *Id.* at 236.   Read with the proper deference
to the magistrate's determination, the details in the affidavit and
Alvarez's admissions against his penal interest and his personal
knowledge   indicate   that   the   magistrate   made   a   reasonable
determination when finding there was probable cause to issue the
warrant.

     The   court   finds   that   "the   magistrate   was   provided   with
sufficient reliable information from which he could reasonably
conclude that the items sought in the warrant were probably at the
location sought to be searched."   *United States v. Wake*, 948 F.2d

1422, 1428 (5th Cir. 1991) (internal quotation marks and citation omitted).

* * *

Accordingly, for the reasons explained, Campos' December 14, 2009 motion to suppress and Tobias' December 15, 2009 motion to suppress are denied.

**SO ORDERED.**

February 9, 2010.

SIDNEY A. FITZWATER
CHIEF JUDGE

– 19 –